## BABETTE MAYER *v.* ANNA F. C. MARTIN.

1. PARTY WALLS. *Contribution to cost. Agreement.*

   A verbal agreement by a lot owner to pay half the cost of a wall to be built by an adjoining owner does not run with the land, and is not enforcable by the vendee of such adjoining owner.

2. SAME. *Adverse possession.. Limitation. Color of title.*

   Continuous exclusive possession for the period of limitation of a building, consisting in part of a wall intended for a party wall but by mistake located wholly on land adjoining that of the lot owner, who erected the building, does not give the remote vendee of such owner, under deeds which do not include the wall, any right to one-half of the value of the wall or to damages for injury to any part thereof, unless to the half adjoining his lot as against the owner of the land upon which the wall is located.

3. SAME. *Assignment.*

   Where damages to a wall built on the land of an adjoining lot owner was done during the tenancy of a certain owner of the building of which the wall was a part, such owner alone, if any one, could sue for such damage, and an action would not lie by his vendee under an assignment of all his rights of action for damages for acts done by way of trespass on his lot or unlawful entry on the same or in consequence of which the building on his premises had been damaged.

4. SAME. *Compensation. Presumption.*

   Each purchaser of either lot on which a party wall has been placed has the right to assume that any compensation as between their vendors has been paid. Kells v. Helm, 56 Miss., 700, cited.

FROM the circuit court of Warren county.

HON. GEORGE ANDERSON, Judge.

Mrs. Martin, appellee, was plaintiff in the court below; and Mrs. Mayer, appellant, was defendant there. From a judgment in plaintiff's favor, defendant appealed to the supreme court.

The opinion states the case.

*Dabney & McCabe,* for appellant.

It cannot be said that because Mayer did not pay for one-half of the wall he owes this to the plaintiff, if she did not own that half of the wall. It was built upon Holloman's land and he promised Stanton to pay for it when he should use it, but his contract was with Stanton. No right to this compensation for the use of the wall passed by the mesne conveyances from Stanton and McKenna to Mrs. Martin. It is not pretended that there was any transfer of such interest in any of the deeds. This was an indebtedness or liability of Mrs. Mayer to Stanton and McKenna, if to anybody, and was purely personal in its character. By what right can it be said that Mrs. Martin acquired this? The wall was not upon her land, and it was not conveyed to her. This question is settled by authority. 22 Am. & Eng. Enc. (2d ed.), 255.

If Stanton and McKenna were content to build one-half of the wall on their neighbor's lot under an agreement that the neighbor would reimburse them if they should build to it, and they afterwards sold their lot without any conveyance within the calls of their deed of the one-half of the wall on their neighbor's lot, how can it be said that their grantees acquired any right to the wall not embraced in their deed? It seems to us that this is too plain for controversy.

It was said in the argument in the lower court that Mrs. Martin had been in possession of this property all the time, and hence had acquired some sort of ownership of the south half of the wall by adverse possession, but this contention is not sustained by any evidence whatever. There is not a syllable of testimony indicating any use of that wall other than by the use of the house. That was not an exclusive or adverse holding. It was nothing more than the use of the lateral support which that wall afforded. It is not shown or pretended that she claimed any rights in any portion of the building or this wall other than through the deeds of the parties through whom

she claims, but even if there was evidence tending to show that she had some sort of adverse or exclusive possesion of this half of the wall, the court took the case entirely away from the jury and gave a peremptory instruction that they should find for the plaintiff to the extent of the value of half of the wall, with interest.

There are many cases by this court defining the rights of parties who claim by adverse possession. They all agree that possession begun permissively and not adversely is presumed to continue as begun without any adverse or hostile claim, unless it shall be asserted and notice imparted of such claim. The beginning of this use was permissive, that is, if half of a wall is susceptible of an adverse holding, under such circumstances, such as existed in this case, there is nothing in the record to show that the character of the holding was changed from what it was in the beginning, by any of the owners of the Stanton and McKenna lot. *Rothschild* v. *Hatch,* 54 Miss., 554; *Dean* v. *Tucker,* 58 Miss., 487; *Dixon* v. *Cook,* 47 Miss., 220; *Davis* v. *Bowmar,* 55 Miss., 671; *Green* v. *Mizelle,* 54 Miss., 220.

Our statute, §§ 3139 and 3140, Code 1892, do not apply to this case. They apply only as between two parties, owners of adjoining lots, one of whom has built the wall. There is nothing in these statutes in conflict with the authorities cited.

It was held by this court in *Hoffman* v. *Kuhn,* 57 Miss., 746, that the right of adjoining owners in party walls is an easement in the land and one-half of the wall of the other party. That being true there can be no claim of exclusive or adverse right on the part of Mrs. Martin, or those through whom she claims, even if she had any sort of possession of this south half of the wall other than that which went along with the general use of the house.

It was held by this court in *Kells* v. *Helm,* 56 Miss., 700, that the purchaser of a lot on which stands a party wall, with-

out notice of any agreement of his vendor to pay for half of the wall, takes the property freed from that encumbrance, if it was an encumbrance; that he has a right to presume that the wall has been paid for. In this case there was no lien or encumbrance in writing, and it was a mere oral promise, which was personal, as we have already stated. Hence, we say that Mrs. Mayer does not owe anybody for the half of that wall. Stanton and McKenna are not claiming it. There appears to be no sort of assignment of their claim to the plaintiff in this case, nor is there any evidence of notice to Mrs. Mayer that it had not been paid for. No reference is made in any of the deeds for either of the lots to the south half of this wall, and hence both parties bought their lots without any sort of notice as to the arrangement under which the wall was erected.

Mrs. Mayer bought the lot with certainly one-half of the wall on it, and therefore bought that half of the wall. The north half may have been lost to her by limitations. She had no notice that the south half of the wall did not belong to the land she bought, and had the right to presume that it did so belong.

When Mrs. Martin bought her lot she only got 29 feet. It is absurd to talk about her having had adverse possession of the outside half of a wall which in the nature of things was not susceptible of adverse possession. Her possession before the sale under the deed of trust must have invested her with title to the north half of the wall which may have continued to be hers notwithstanding the sale under the deed of trust, because it was not embraced in the 29 feet conferred by the deed of trust and the deed to Cæsar. But as to the south half of the wall she can only claim that her ten years' possession of the building gave her an easement in the lateral support afforded by it. Her possession was a continuation of that of Stanton and McKenna through intermediate conveyances. True, they did not cover this wall, but they were supposed to do so, and it was the same permissive use and possession by Stanton

and McKenna which was handed down with the different convey-
ances, and it never became adverse and was never claimed to be
adverse, so far as the evidence in this case shows.

The only right she has in the wall grows out of this use of it.
She acquired no rights in it through the Cæsar deed, because
no portion of the wall was covered by that deed; hence, it can-
not be said that she, as the subsequent vendee of Stanton and
McKenna, is entitled to stand in their shoes in respect to the
compensation to be paid for the wall, even if Holloman's prom-
ise ran with the land and was not personal. Her rights in the
wall, if any, do not arise under grant, but by adverse possess-
ion. There is no privity between her and Stanton and McKenna
in respect to this wall.

It will be observed that the assignment by Cæsar of his right
to sue is limited to his right of action for trespasses, and no in-
timation of a right to the south half of the wall was contained in
it. From this and the filing of the third count in the declara-
tion over a year after the suit was brought, it is strongly sug-
gested that the claim for the value of one-half of the wall was an
afterthought and a sort of mending of their hold. See *Block*
v. *Isham,* 28 Ind., 37; *Weld* v. *Nichols,* 17 Pick., 538, 543;
*Lost* v. *Hornbrook,* 2 W. Va., 346; *Nalle* v. *Paggi,* 1 L. R A.,
33, and note.

*Magruder, Bryson & Dabney,* for appellee.

The appellant contends that a hostile possession, however
absolute the exercise of dominion, cannot be predicated of a
wall or a part of a wall and the ground it occupies adjacent to a
vacant lot, if in the inception a personal agreement was made
between the prior owners, looking to the use of the wall in the
future as a party wall, either because (1) the agreement be-
comes a continuous covenant, (2) because subsequent vendees
are estopped or set up the fact of adverse possession, (3) be-
cause a personal easement once created imparts its character
by force of law to all subsequent vendees and renders nugatory

all hostile acts of ownership, though unknown to the holder; that the mystic power of this easement agreement, once made may silently sleep, unknown to the subsequent owners, but once resurrected. and invoked, all facts of adverse holding are magically converted into a permissive holding. The very statement of these propositions bears upon its face their palpable fallacy. The second contention of appellant seeks to apply the well known doctrine that possession, which is permissive in its inception, will be presumed so to continue, unless it be renounced or disclaimed by acts of ownership of such publicity or notoriety as will impart notice by legal implication; or, put more concretely, that the use and occupation of such a wall and the ground it occupies being in the first place permissive, cannot be converted into an adverse holding, unless the claim is distinctly brought to the notice of the owner, and that the ordinary use and occupation of a building is not such an assertion of ownership of the whole wall and the ground it occupies as would impart notice of an adverse holding. This one of the contentions running irregularly through the argument of appellant may be definitely formulated as above, and which puts the argument in stronger form than appellant has done for himself.

We think we can demonstrate the fallacy of the argument:

1. It should be remembered that the permissive possession which is presumed to continue till proven to have become hostile when based upon a personal parol agreement, applies only to the individuals with whom the agreement is made, and it is by the force of his obligation that it is presumed to continue, but it cannot be extended by implication to another person, his vendee, who has no knowledge of the agreement. The character of one's possession cannot be affected by an agreement of another of which he has no knowledge. It is plain that all the elements of adverse possession may exist and yet, by a simple understanding or agreement, be subordinated to another title. But the same facts without such an agreement would constitute an adverse holding. Martin could not be called upon to renounce

an agreement and its consequences, of which he had no knowledge, except by such acts of notorious ownership as are incident to the belief and claim of ownership.

2. The character of every possession involves a mental attitude, a belief, a claim and an intention indicated by acts. To be adverse, there must be claim of title and ownership and an intention to assert it, and in cases like this also a belief in the validity of the claim, and the law presumes a mental attitude on the part of the adverse claimant, to wit, acquiescence.

A subordinate holding implies an acknowledgement of the true title on the one hand, and on the other hand the consent of the holder of the title to possession. This very consent is an assertion of dominion over the land permitted to be occupied by another. This assertion of dominion and this consent to subordinate occupation, when done in pursuance of an agreement, must be continuous and conscious acts of the will on the part of the owner and his vendee. Yet the contention of appellant is, that this element of subordination to the title having once existed, is transmitted to successive vendees, who, though ignorant of the fact, continue in some mystic, in *gregio legis* way to hold on unconsciously to the sway and dominion of the property, qualified by a consent also unconscious to a permissive holding by another.

That the agreement once made will define the boundaries of the holding, and although unknown to subsequent vendees will, by force of law, give character and quality to their possession regardless of all facts of their adverse possession is a *reductio ad absurdum.*

Again, this contention that Martin's acts of ownership are not to be taken as evidence of an adverse holding, because, being of a part of a wall, such acts are consistent with a permissive holding, under the agreement, is also fallacious; for the reason that if there be a belief in one's title and a claim of ownership it can only be asserted in the usual way, and if continued it must be taken to be exclusive and complete. It is the or-

dinary and common sense way to deal with such facts, and the affairs of men. He who occupies a building claiming and asserting it to be his, must be deemed to hold the whole of it adversely, unless his holding and his acts be shown to be subordinate. If it was subordinate it was because there was a superior title asserted by another and so acknowledged. If Holloman and his vendees for thirty-five years rested their title upon a verbal agreement, they could have kept alive their assertion of dominion and given notice of their claims. They were called upon to assert their right, which seemed inconsistent with the acts of ownership asserted by Martin. Martin was not called upon to make any assertion beyond the proclamation to the world that he was the owner of the building, and all that so doing implied.

In short, we affirm that a state of facts, which in themselves constitute adverse possession, cannot be defeated by proof of an oral agreement between former owners. One's rights are not to be determined by a personal agreement, *inter alia,* of which he had no notice. The reason that such an agreement is effective in certain cases is because it imparts an acknowledgment of another's title. Martin could not acknowledge, or recognize a title through the consequence or effect of any fact of which he had no knowledge.

Again, we affirm that inasmuch as Catchings and Martin occupied and claimed the property adversely, based upon the belief that such was the true boundary of the lot, it must be presumed, in the absence of all proof to the contrary, that the owners of the adjacent lot during that time acquiesced in the same belief, and this necessarily follows from the fact that when Mayer bought, he had the same understanding and belief about the boundary.

We also contend that if the agreement is to be invoked against Martin it must be taken *cum onere,* with the correlative duty devolving upon Mayer to pay for one-half of the wall.

We know that such obligation on the part of Holloman would

of itself impose no liability upon his vendee, but would be effect-
ive as against Stanton on the question as to the character and
quality of his possession, not by force of an obligation as such,
but because there is involved in the agreement the element of
acknowledging the Holloman title.   It is because of the mental
attitude of Stanton towards the title, which is incident to the
agreement, which determines his possession.   But if the agree-
ment is to be invoked against Martin to characterize his posses-
sion, it cannot be because it denotes his mental attitude, for
that is unconceivable.   It must be invoked then upon some
theory, of its force, as an obligation devolved upon him, and if
he is to be bound by the agreement as to his possession,
so   Mayer   will   be   bound   by   the   same   obligation   to
pay.   Both of which propositions we, however, submit are ab-
surd.   But if one exists the other must also exist.

CALHOON, J., delivered the opinion of the court.

This was an action for damages by Mrs. Martin against Mrs.
Mayer, arising out of the construction of an attachment to a
brick wall, which Mrs. Martin claimed to be her individual
property, and the latter claimed to be a party wall, to which she
had the right to build, and, for reasons to be shown, without
compensation.   In her original declaration, consisting of two
counts, filed March 21, 1902, Mrs. Martin sets up in the first
count that she is the owner of the lot on which the wall stands;
that she acquired title from one Cæsar; that on the lot was a
two-story brick building, of which the wall was part, which
Cæsar had erected; that Mrs. Mayer, owning an adjoining lot
on the south side, built thereon a two-story brick building, and
wrongfully cut into the wall, while Caesar was the owner,
using it for part of the new building, and thereby became liable
to her for $500, that being half the value of the wall; and Mrs.
Martin bases her right of action on an assignment by Cæsar to
her.   The second count also bases the right of action on Cæsar's
assignment, and claims damages in $1,000, because of the im-

proper construction of the annex injuring the old wall. The third count, filed a year after, is without reference to Cæsar's assignment, and proceeds on the basis of the ownership of Mrs. Martin, and the unlawful appropriation of the south wall by Mrs. Mayer in erecting her annex, and claims $500 as half the value of the wall. Under this count her claim developed on the trial as a claim of title by prescription by continuous adverse possession of the south half of the wall by her and those under whom she claimed for more than ten years. This is in fact the question of the case in view of the rulings of the court below, and it is indisputably true from the testimony that there was continuous exclusive possession of the building of which all the old wall was part by Mrs. Martin and others for about thirty years, the only remaining question as to this being whether it was adverse and continuous under color of title or under the deeds. Cæsar, under whom Mrs. Martin immediately claims, conveyed to her on December 31, 1900, a certain lot 29 feet wide north and south by 73 feet 9 inches long east and west, on which was the building of which the old wall was part, though it appears that in fact, unknown to any of the owners of either lot, the whole of this wall was on the lot now owned by Mrs. Mayer, the appellant, under the calls of the deeds. Cæsar, having conveyed, as stated, to Mrs. Martin on December 31, 1900, afterwards, on January 21, 1901, executed to her the assignment referred to, which is in the following words: "I hereby assign, transfer, set over, and deliver unto the said Anna F. C. Martin all claims of any and every kind whatsoever, together with all rights of action which I may be supposed to have against Babette Mayer for damages for any and all acts done by him (her?) by way of any unlawful trespass on the said property, or by way of any unlawful entry upon the same, and by way of any acts in consequence whereof the building upon said premises has been damaged." The plaintiff, Mrs. Martin, asked but one instruction, and the court granted it, as follows (italics ours):

"The court instructs the jury to find for the plaintiff and assess
her damages. *She is entitled to recover one-half of the value*
of the wall at the time it was taken, as shown by the evidence,
and six per cent interest thereon from November 1, 1899, to
date; and if, from the evidence, they believe that *her building*
was damaged by the erection of the defendant's building and
the joining of the same to her building, they will *also* find for
her such *additional sum* as they may believe from the evidence is
sufficient to compensate for such injury." The court refused a
peremptory instruction asked by Mrs. Mayer to find for defend-
ant, refused one to find for her if the evidence showed that the
wall was built as a party wall, refused one that the jury leave
the use of the wall by the defendant out of consideration, and
consider only whether or not W. J. Cæsar was damaged by the
annex, and finally refused one that the plaintiff could recover
nothing for the use of the wall.

The court must have taken the view from the evidence that,
independently of Cæsar's deed to her, Mrs. Martin had title by
prescription to the south half of the wall. The instruction hav-
ing been peremptory to find for plaintiff, the following must be
taken as absolutely true from the evidence: The plaintiff, Mrs.
Martin, claims title through successive conveyances from Stan-
ton and McKenna. The defendant, Mrs. Mayer, claims title
through successive conveyances from Rebecca Holloman. In
1867, 1868, and 1869, Stanton and McKenna owned the north
lot and Holloman owned the south lot, the two adjoining. At
some time during these three years, both lots being vacant, Stan-
ton and McKenna desired to erect and did erect a two-story brick
building, the south wall of which they designed to put one-half on
their own lot and one-half on Holloman's. Both they and Hollo-
man thought this was done, but all were mistaken, and the wall,
as a matter of fact, was put wholly on Holloman's lot. Before
the building was erected it was verbally agreed between Stan-
ton and McKenna and Holloman that the south wall of the build-
ing should be a party wall, and joist holes were left in it for

that purpose, and, whenever Holloman saw fit to build, he was to pay Stanton and McKenna for one-half of the wall. Stanton and McKenna never communicated the fact of this agreement to their immediate vendee when they sold in December, 1869, nor did Holloman's heirs, when they sold in March, 1882, and no subsequent owner of either lot knew anything about such agreement until the present controversy between Mrs. Martin and Mrs. Mayer developed it after the erection by Mrs. Mayer of her annex to the wall. By actual measurements under the calls of the conveyances, none of them from Stanton and McKenna down to Mrs. Martin take in any of the old wall. The verdict of the jury for $240 was undoubtedly responsive to the peremptory charge that Mrs. Martin was entitled to recover one-half the value of the wall, and it is plain that the jury found no damages for injury to the old building by any improper construction of the new. There was much and strong evidence that not only was there no damage, but that the old building was actually strengthened and benefited by the annex. It is the law, as we think, and it seems to be conceded, that Holloman's agreement with Stanton and McKenna to pay half the value of the wall when she should build did not run with the land, even if the conveyance by its description embraced the land on which the wall stood. The vendees of Stanton and McKenna, near or remote, cannot avail of this agreement. It must be assumed, in the attitude of this case before us, that not one of the seven conveyances executed from Stanton and McKenna down, before there ever was any to Mrs. Martin, embraced the land on which the wall stands. The deed from Cæsar, her immediate vendor, to her, does not embrace it; nor does her previous deed to the trustee, nor his to Cæsar. If, in law, the agreement did run with the land, it is conclusive that Caesar alone could sue Mrs. Mayer for one-half of the wall, because Mrs. Mayer erected her annex while Caesar was the owner, and his assignment transfers no right to Mrs. Martin to sue for this. In this view, Caesar alone could sue. We cannot subscribe to the contention that

Mrs. Martin can recover this value because at one time she occupied the house of which the wall was a part for more than ten years. As to this it is sufficient to say that she did not so occupy as owner of the wall, nor did any one of the antecedent purchasers of the north lot. The first deed to her is of date May 11, 1884, and it does not include the wall, and her deed to the trustees was of date May 10, 1891, and Cæsar's deed to her October 10, 1898, and none of these embraced the wall. Doubtless all assumed that the conveyances embraced at any rate the north half of the wall, if they ever thought about it at all, and the claims to this may or may not be well founded; but we repudiate the idea that it may be extended to the south half of a wall, which, as was very plainly to be seen, was built as a party wall, on the ground of open, notorious adverse possession. If Mrs. Martin had never bought from Cæsar, is there any court on earth which would sustain her in an action of ejectment against him for the south half of the wall because of adverse possession? But her position here is that she is the owner of the south half of the wall, which is plainly a party wall, by adverse posession, when, but for Cæsar's conveyance to her, she would not have the slightest title, either legal or equitable, to any land there at all, and this conveyance does not embrace the south half of the wall. It seems to us that the most she can claim, if anything, is damages to the north half of the wall.

Proceeding on the idea that the wall was in fact placed on the boundary, one-half on each lot, which is the utmost that Mrs. Martin can possibly claim, this case is settled by *Kells* v. *Helm,* 56 Miss., 700, on the ground that each purchaser of either lot, finding the party wall so built, had the right to assume that any compensation as between Stanton and McKenna and Holloman had been paid.

*Reversed and remanded.*